In the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Peter T. ELLIOTT, Attorney at Law:

OFFICE OF LAWYER REGULATION, Complainant,

v.

Peter T. ELLIOTT, Respondent.

Supreme Court

*No. 2010AP0260-D. Decided November 3, 2010.*

2010 WI 124

(Also reported in 790 N.W.2d 508.)

¶ 1. PER CURIAM. We review the report and recommendation of the referee, Reserve Judge Timothy L. Vocke, that Attorney Peter T. Elliott's license to practice law in Wisconsin be revoked; that he be required to pay restitution to two former clients, a financial institution that was the victim of his check-kiting scheme, and the Wisconsin Lawyers' Fund for Client Protection (the Fund); and that he be required to pay the costs of this disciplinary proceeding, which were $4,960.72 as of June 1, 2010.

¶ 2. After conducting our review of the matter, we accept the referee's findings of fact, which were based on the allegations of the complaint filed by the Office of Lawyer Regulation (OLR) due to Attorney Elliott's default. We agree that those facts show that Attorney Elliott engaged in professional misconduct, as alleged in

the 51 counts of the complaint. We determine that Attorney Elliott's pattern of deliberately deceitful behavior requires that his license to practice law in this state be revoked. We further order Attorney Elliott to make restitution payments as outlined in the referee's report. Finally, we impose the full costs of this proceeding on Attorney Elliott.

¶ 3. Attorney Elliott was admitted to the practice of law in Wisconsin in 1974. He most recently practiced with a private law firm in West Allis. On January 13, 2009, this court temporarily suspended Attorney Elliott's license due to his failure to cooperate with a number of OLR investigations. His license was also suspended for non-payment of bar dues and supreme court assessments, for non-compliance with continuing legal education reporting requirements, and for non-compliance with the client trust account certification requirement. His license remains suspended as of the date of this opinion.

¶ 4. The OLR's formal complaint in this matter was personally served on Attorney Elliott on February 11, 2010. Attorney Elliott did not file an answer to the complaint. Despite multiple attempts by counsel for the OLR to contact Attorney Elliott, he did not appear for a scheduling conference on March 17, 2010. The referee subsequently granted the OLR's motion for the entry of a default.

¶ 5. Because of the default, the referee accepted all of the factual allegations of the complaint as his findings of fact. Based on those facts, the referee concluded that the OLR had established that Attorney Elliott had engaged in 51 separate acts of professional misconduct.

¶ 6. Given the voluminous nature of the very serious factual findings against Attorney Elliott, it is not necessary that we repeat all of the referee's factual

findings here. It is sufficient to provide some summary information and a description of the pattern that many of Attorney Elliott's misdeeds followed.

¶ 7. The 51 counts of professional misconduct arose out of 12 separate client representations and Attorney Elliott's handling of his client trust account and business account. Twelve of those counts involved Attorney Elliott's failure to hold funds belonging to clients or third parties in trust and his conversion of those funds for other purposes. *See* SCRs 20:8.4(b),[1] 20:8.4(c),[2] and 20:1.15(b)(1).[3] Similarly, another ten counts involved Attorney Elliott's failure to promptly disburse funds to clients or to third parties who were legally entitled to receive them. *See* SCR 20:1.15(d)(1).[4] Five counts in-

---

[1] SCR 20:8.4(b) provides it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; . . . ."

[2] SCR 20:8.4(c) states it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . ."

[3] SCR 20:1.15(b)(1) provides: Separate account.

> A lawyer shall hold in trust, separate from the lawyer's own property, that property of clients and 3rd parties that is in the lawyer's possession in connection with a representation. All funds of clients and 3rd parties paid to a lawyer or law firm in connection with a representation shall be deposited in one or more identifiable trust accounts.

[4] SCR 20:1.15(d)(1) provides: Notice and disbursement.

> Upon receiving funds or other property in which a client has an interest, or in which the lawyer has received notice that a 3rd party has an interest identified by a lien, court order, judgment, or contract, the lawyer shall promptly notify the client or 3rd party in

589

volved Attorney Elliott's issuance of checks from his client trust account to himself or his law firm without identifying the client and matter or the reason for the disbursement. *See* SCR 20:1.15(f)(1)e.1.[5] Three counts related to instances when Attorney Elliott either issued checks from his client trust account made payable to "cash" or made cash withdrawals from his client trust account. *See* SCR 20:1.15(e)(4)a.[6] Eight counts involved situations where Attorney Elliott either failed to provide required information to clients or failed to respond to a client's request for information or an accounting of funds. *See* SCRs 20:1.4(a)(1),[7] 20:1.4(a)(3),[8]

writing. Except as stated in this rule or otherwise permitted by law or by agreement with the client, the lawyer shall promptly deliver to the client or 3rd party any funds or other property that the client or 3rd party is entitled to receive.

[5] SCR 20:1.15(f)(1)e.1 states:

Checks shall be pre-printed and pre-numbered. The name and address of the lawyer or law firm, and the name of the account shall be printed in the upper left corner of the check. Trust account checks shall include the words "Client Account," or "Trust Account," or words of similar import in the account name. Each check disbursed from the trust account shall identify the client matter and the reason for the disbursement on the memo line.

[6] SCR 20:1.15(e)(4)a. provides that "[n]o disbursement of cash shall be made from a trust account or from a deposit to a trust account, and no check shall be made payable to 'Cash.'"

[7] SCR 20:1.4(a)(1) states a lawyer shall "[p]romptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in SCR 20:1.0(f), is required by these rules; . . . ."

[8] SCR 20:1.4(a)(3) says a lawyer shall "keep the client

20:1.4(a)(4),[9] 20:1.15(d)(2),[10] and 20:1.15(g)(1).[11] Finally, eight other counts related to Attorney Elliott's failure to respond to the OLR's investigations. SCRs 20:1.15(e)(7),[12]

reasonably informed about the status of the matter; . . . ."

[9] SCR 20:1.4(a)(4) provides that a lawyer shall "promptly comply with reasonable requests by the client for information; . . . ."

[10] SCR 20:1.15(d)(2) states, "Upon final distribution of any trust property or upon request by the client or a 3rd party having an ownership interest in the property, the lawyer shall promptly render a full written accounting regarding the property."

[11] SCR 20:1.15(g)(1) provides: Notice to client.

At least 5 business days before the date on which a disbursement is made from a trust account for the purpose of paying fees, with the exception of contingent fees or fees paid pursuant to court order, the lawyer shall transmit to the client in writing all of the following:

a. an itemized bill or other accounting showing the services rendered;

b. notice of the amount owed and the anticipated date of the withdrawal; and

c. a statement of the balance of the client's funds in the lawyer trust account after the withdrawal.

[12] SCR 20:1.15(e)(7) states as follows: Production of records.

All trust account records have public aspects related to a lawyer's fitness to practice. Upon request of the office of lawyer regulation, or upon direction of the supreme court, the records shall be submitted to the office of lawyer regulation for its inspection, audit, use, and evidence under any conditions to protect the privilege of clients that the court may provide. The records, or an audit of the records, shall be produced at any

22.03(2),[13] and 22.03(6),[14] enforceable through SCR 20:8.4(h).[15]

¶ 8. A number of the client representations described in the OLR's complaint and the referee's report followed a similar pattern. Attorney Elliott would be

disciplinary proceeding involving the lawyer, whenever material. Failure to produce the records constitutes unprofessional conduct and grounds for disciplinary action.

[13] SCR 22.03(2) states:

Upon commencing an investigation, the director shall notify the respondent of the matter being investigated unless in the opinion of the director the investigation of the matter requires otherwise. The respondent shall fully and fairly disclose all facts and circumstances pertaining to the alleged misconduct within 20 days after being served by ordinary mail a request for a written response. The director may allow additional time to respond. Following receipt of the response, the director may conduct further investigation and may compel the respondent to answer questions, furnish documents, and present any information deemed relevant to the investigation.

[14] SCR 22.03(6) states:

In the course of the investigation, the respondent's wilful failure to provide relevant information, to answer questions fully, or to furnish documents and the respondent's misrepresentation in a disclosure are misconduct, regardless of the merits of the matters asserted in the grievance.

[15] SCR 20:8.4(h) provides it is professional misconduct for a lawyer to "fail to cooperate in the investigation of a grievance filed with the office of lawyer regulation as required by SCR 21.15(4), SCR 22.001(9)(b), SCR 22.03(2), SCR 22.03(6), or SCR 22.04(1); . . . ."

hired by a buyer or seller in a real estate transaction or by the financial institution that was lending money to the buyer for the transaction. As a result of his being retained, he would receive substantial sums of money that he was to hold in trust and then distribute to various parties at the closing of the transaction. Attorney Elliott would often receive those funds days or even weeks in advance of the closing. Before the closing occurred, Attorney Elliott would improperly disburse some or all of those trust funds to himself or his law firm, or he would use some or all of those trust funds to cover payments in other real estate transactions. This would result in there being insufficient funds in Attorney Elliott's trust account to make the necessary payments at the time of closing. At times, Attorney Elliott would issue checks from his trust account for the required closing payments even though there were insufficient funds to cover those checks, but he would then stop payment on the checks or those checks would be returned for insufficient funds. Often, he then had to make excuses or misrepresentations in order to explain why he had stopped payment or failed to make a required payment. Ultimately, in order to cover the closing payments he was required to make, Attorney Elliott would often use client trust funds obtained from other clients that were supposed to be used for other, future transactions.

¶ 9. In September and October 2008 Attorney Elliott turned to a check-kiting scheme. He maintained a business account at Wells Fargo Bank and a client trust account at Associated Bank. From September 24, 2008, through October 31, 2008, Attorney Elliott routinely wrote checks out of his Wells Fargo business account for hundreds of thousands of dollars each, although he knew the business account did not contain

sufficient funds to cover those checks.[16] He would almost immediately deposit the checks or the proceeds from the checks into the Associated Bank client trust account. Before the check written against the business account would clear, Attorney Elliott would stop payment on the check. Because of the delay in processing the transactions, the balance in the trust account would remain inflated for some period of time.

¶ 10. On some days Attorney Elliott wrote checks or withdrew cash from his client trust account against the falsely inflated balance in that account. For example, on October 3, 2008, Attorney Elliott made two cash withdrawals from the trust account totaling $506,145.06, although the true balance in the trust account was far less. He used that cash to purchase four cashier's checks. One of those checks, in the amount of $350,000.00, was apparently used to repay a personal or business loan that Attorney Elliott had received from an individual.

¶ 11. Between October 6, 2008, and October 31, 2008, Attorney Elliott made 50 deposits into his trust account using checks drawn on his business account for which there were insufficient funds. Each of the busi-

---

[16] For example, the balance in Attorney Elliott's business account was $3,738.40 at the close of business on September 30, 2008. On October 1, 2008, Attorney Elliott disbursed a check in the amount of $665,000 from his business account that was made payable to "Atty. Peter T. Elliott Trust Account." That same day he subsequently deposited the check into his trust account. After that deposit, Attorney Elliott then stopped payment on the business account check. Thus, at the close of business on October 1, 2008, the $665,000 check had not been presented to the business account, but the balance in the business account was only $2,029.90, which was $662,970.10 less than the amount of the check that had been written against that account.

ness account checks (and therefore each of the trust account deposits) was subject to a stop payment order before the check cleared. The total amount of the 50 deposits over that span of 25 days was $31,236,500. Between October 3, 2008, and October 30, 2008, a total of 15 checks, in the total amount of $50,850, were written from the trust account payable either to Attorney Elliott or his law firm. None of those 15 checks had any discernible connection to a client matter. All but two of the checks were deposited into Attorney Elliott's business account, and the funds from those checks were used to pay various business expenses. Ultimately, the OLR calculated that Attorney Elliott used the falsely inflated balance in his trust account to improperly obtain a total of $942,792.70 from Associated Bank.

¶ 12. Given the number and nature of the violations, the referee strongly recommended that Attorney Elliott's license to practice law in Wisconsin be revoked. He commented that he had found no mitigating factors and that Attorney Elliott's conduct "[had] brought disrepute not only to himself but to the legal system."

¶ 13. Because no appeal was filed from the referee's report and recommendation, our review proceeds pursuant to SCR 22.17(2).[17] When reviewing a report and recommendation in an attorney disciplinary

---

[17] SCR 22.17(2) states:

If no appeal is filed timely, the supreme court shall review the referee's report; adopt, reject or modify the referee's findings and conclusions or remand the matter to the referee for additional findings; and determine and impose appropriate discipline. The court, on its own motion, may order the parties to file briefs in the matter.

proceeding, we affirm a referee's findings of fact unless they are found to be clearly erroneous. *In re Disciplinary Proceedings Against Inglimo,* 2007 WI 126, ¶ 5, 305 Wis. 2d 71, 740 N.W.2d 125. We review the referee's conclusions of law, however, on a de novo basis. *Id.* Finally, we determine the appropriate level of discipline given the particular facts of each case, independent of the referee's recommendation, but benefiting from it. *In re Disciplinary Proceedings Against Widule,* 2003 WI 34, ¶ 44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶ 14. In light of Attorney Elliott's default, we accept the referee's findings of fact. We also agree with the referee that the facts set forth in the complaint support the legal conclusion that Attorney Elliott engaged in 51 counts of professional misconduct.

██

¶ 15. With respect to the level of discipline, we wholeheartedly agree with the referee's comment that Attorney Elliott is not fit to be licensed as a lawyer in the state of Wisconsin. He engaged in a lengthy pattern of converting for his own benefit client or third party funds that had been entrusted to him. He used trust account funds from one client to cover his misappropriation of funds from another client. He even resorted to a multi-million dollar check-kiting scheme to continue his theft of others' money. When asked for information by the OLR, Attorney Elliott merely stonewalled and never provided a response. Clearly, the only appropriate discipline for such misconduct is revocation.

¶ 16. With respect to costs, we note that Attorney Elliott has not objected to the statement of costs filed by the OLR. We find no extraordinary circumstances that

would warrant any reduction of the costs, and we impose the full costs of the proceeding on Attorney Elliott.

¶ 17. Finally, we turn to the issue of restitution. The OLR's complaint requested and the referee recommended that Attorney Elliott be required to make restitution payments in the total amount of $1,334,804.26. We note that Attorney Elliott has never contested the OLR's assertion that he should pay restitution to the Fund,[18] to two former clients, and to Associated Bank, nor has he disputed the requested amounts of restitution. Consequently, we determine that Attorney Elliott should be ordered to pay restitution to the Fund, to the former clients, and to Associated Bank in the amounts set forth in the referee's report.

¶ 18. IT IS ORDERED that the license of Peter T. Elliott to practice law in Wisconsin is revoked, effective as of the date of this order.

¶ 19. IT IS FURTHER ORDERED that within 180 days of the date of this order Peter T. Elliott shall pay restitution in the following amounts to the following individuals/entities:

- $175,709.09 to the Wisconsin Lawyers' Fund for Client Protection ($150,000 regarding client B.E.L.C. and $25,709.09 regarding client S.W.);

- $132,219.67 to client S.W.;

- $84,082.80 to client B.E.L.C.; and

- $942,792.70 to Associated Bank.

[18] The Fund reimbursed certain former clients for losses caused by Attorney Elliott's misconduct.

¶ 20. IT IS FURTHER ORDERED that within 180 days of the date of this order, Peter T. Elliott shall pay to the Office of Lawyer Regulation the costs of this proceeding.

¶ 21. IT IS FURTHER ORDERED that the restitution specified above is to be completed prior to paying costs to the Office of Lawyer Regulation.

¶ 22. IT IS FURTHER ORDERED that to the extent he has not already done so, Peter T. Elliott shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been revoked.